

# In the Missouri Court of Appeals
# Eastern District

<u>**DIVISION TWO**</u>

| | | |
|---|---|---|
| ALANA HAUCK, | ) | No. ED113098 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | Cause No. 2322-CC05184 |
| | ) | |
| THE POLICE RETIREMENT SYSTEM | ) | Honorable Jason M. Sengheiser |
| OF ST. LOUIS, et al., | ) | |
| | ) | |
| Appellants. | ) | FILED: September 2, 2025 |

## Introduction

The Police Retirement System of St. Louis and individual members of its Board of Trustees (collectively, "PRS") appeal the circuit court's reversal of PRS's decision denying Alana Hauck's (Hauck) application for service-connected disability retirement benefits pursuant to section 86.263.[1] Because Hauck is the party aggrieved by the agency's decision, she filed the appellant's brief and reply brief pursuant to Rule 84.05(e).[2] In Point I, Hauck argues PRS erred by improperly applying alleged symptom magnification to the exclusivity requirement in section 86.263. In Point II, Hauck claims PRS erred in denying her application because its decision was unsupported by competent and substantial evidence. As to Point I, we hold PRS erred by applying alleged symptom magnification to the exclusivity requirement. Accordingly, we grant the point, which is

---

[1] All statutory references are to RSMo (2016).
[2] All rule references are to the Missouri Supreme Court Rules (2024).

dispositive of the appeal. We affirm the circuit court's judgment and remand to PRS for reconsideration of only whether Hauck's incapacitation was the exclusive result of her work accident.

Factual and Procedural Background

Lieutenant Hauck, a more than 20-year veteran with the St. Louis Metropolitan Police Department (SLMPD) responded to a protest outside the Medium Security Institution on July 21, 2017. She was holding a line with other officers in a phalanx formation. Hauck's left arm was extended, holding on to the shoulder of the officer in front of her, and she held a shield with her right hand. While in formation, Hauck was struck in the left arm by an unknown object, and she immediately felt pain shooting down her neck and into her left hand and was unable to move her left hand. She was taken to the emergency room from the scene, where she was diagnosed with a brachial plexus injury. Over the next few years, Hauck received various treatments for her shoulder and spine.

A.    Shoulder Injury

Hauck underwent electrodiagnostic studies on August 23, 2017, which were negative for active cervical radiculopathy, brachial plexopathy, or distal entrapment neuropathy. X-rays taken on September 19, 2017, were negative, and a left shoulder arthrogram performed on October 9, 2017, indicated there was no full thickness rotator cuff tear.

On October 25, 2017, Dr. Jason Young assessed Hauck as having left arm pain in the ulnar nerve, but was unable to attribute her current symptoms to a small superior labral (SLAP) tear, which had been discovered in a post-arthrogram MRI. Dr. Young suggested her symptoms could be consistent with either ulnar peripheral neuropathy or a traction injury to the brachial plexus

and/or cervical disc herniation, and noted x-rays revealed degenerative changes at the C6-7 level of her cervical spine.

Hauck was re-examined by Dr. Young on January 17, 2018. Dr. Young suggested she may have potential thoracic outlet symptoms and recommended an evaluation by Dr. Robert Hagan. On January 23, 2018, Dr. Hagan diagnosed Hauck with having left upper extremity pain with ulnar nerve irritation and known cervical spine symptoms, referencing in his report Hauck's treatment for spinal issues with Dr. James Coyle.

On May 9, 2018, Hauck underwent another electrodiagnostic study which was negative for median, ulnar, or radial neuropathy, cervical radiculopathy, and brachial plexopathy. On May 17, 2018, Dr. Hagan referred Hauck for an MR/angiogram of her brachial plexus and noted two of her other doctors did not feel her current symptoms were related to her shoulder.

Hauck returned to Dr. Young on June 20, 2018. He noted MRI results showing a type I SLAP tear, but such tears are abundantly common in the general population and Hauck's did not require surgical intervention. Dr. Young expressed concerns of symptom magnification and believed Hauck could work full duty without limitations in reference to her left shoulder. Dr. Hagan noted her workup for thoracic outlet syndrome and diagnostic injections revealed no evidence of a peripheral nerve etiology to her pain complaints, and accordingly assigned no restrictions to Hauck's work activities.

Hauck was then seen by Dr. Christopher Dy on August 13, 2018. He opined Hauck had a partial injury to her upper trunk at the brachial plexus and noted scapular winging and weakness with elbow flexion, and recommended new electrodiagnostic studies. The third study returned normal results and did not demonstrate clear evidence of a brachial plexopathy or axillary nerve palsy.

3

On December 13, 2018, Hauck saw Dr. Heidi Prather, who suggested a probable brachial plexopathy. However, follow-up imaging of her brachial plexus were found to be normal.

Dr. Alexander Aleem then diagnosed Hauck with left shoulder multi-directional instability with scapular winging on January 29, 2019. Hauck underwent an arthroscopic posterior capsular shift procedure on her left shoulder on March 11, 2019, to tighten down her shoulder to prevent it from dislocating posteriorly.

Following this procedure, Hauck still complained of symptoms in her left shoulder, and returned to Dr. Prather, who ordered another nerve conduction study. The fourth study was completed in November of 2019, and Dr. Prather noted electrodiagnostic findings of chronic axillary neuropathy, but no active denervation or cervical radiculopathy. Dr. Prather advised Hauck she would need continuous treatment over her lifetime and would never be able to fully lift her arm again. Dr. Prather placed Hauck at maximum medical improvement (MMI).

B. Spinal Injury

After her initial visit with Dr. Young at which he raised possible thoracic issues, Hauck underwent a cervical MRI on December 7, 2017. Dr. Coyle noted "mild spondylitic changes at C6-7 with an associated soft tissue disc prolapse," and diagnosed her with C6-7 cervical disc protrusion. Dr. Coyle noted Hauck's examination was not entirely consistent with C6-7 radiculopathy, and referred her for a selective nerve root block at C6-7.

Hauck continued to complain of pain in her cervical spine following the selective nerve root block, as well as other symptoms in her shoulder, arm, and fingers. After Hauck returned for a follow-up appointment on January 11, 2018, Dr. Coyle believed, at that point, she had symptoms of a C6-7 radiculopathy, but not all of her symptoms could be explained by the C6-7 pathology. Dr. Coyle advised her left shoulder be re-evaluated.

4

Hauck returned to Dr. Coyle on February 1, 2018, after having her shoulder re-evaluated by Dr. Young. Hauck continued complaining of pain in her cervical spine, as well as symptoms in her shoulder, arm, and fingers. Dr. Coyle again detailed not all of her symptoms could be explained by her cervical disc, and although there was a high likelihood she would still have residual symptoms if she decided to proceed to surgery, there was some potential for relief.

Hauck decided to proceed with a disc fusion procedure recommended by Dr. Coyle. Prior to the surgery, x-rays were taken of Hauck's cervical spine on February 1, 2018, which revealed degenerative disc disease most severe at the C6-7 level. Hauck underwent the disc fusion procedure days later on February 6, 2018. During the procedure, Dr. Coyle noted the presence of osteophytes, commonly known as bone spurs, at the C6-7 level, but later testified they were "a chronic finding that is secondary to the condition that developed over time," and they were an incidental finding. Dr. Coyle stated in a letter to a claim specialist[3] that the surgery was referable to her work injury, which he believed was the prevailing factor in causing her C6-7 cervical radiculopathy.

On January 13, 2020, Hauck returned to Dr. Coyle complaining of pain in her cervical spine and in her arm. A review of an MRI revealed a disc extrusion, and Hauck was referred for a selective nerve root block at C5-6. Hauck returned for a follow-up on February 11, 2020, and had a "markedly diminished range of motion of her cervical spine with only about twenty degrees of rotation" to either side. Hauck was unable to abduct her shoulder above 40 degrees, which Dr. Coyle credited to ongoing left shoulder pathology. Hauck reported some improvement in a March 12, 2020 follow-up, but reported continuing neck pain and limited range of motion of her shoulder in a visit on April 7, 2020. Dr. Coyle restricted her from firearm use and placed her at MMI.

---

[3] Dr. Coyle was the employer-authorized treating doctor for this work injury.

Hauck underwent a second disc fusion surgery, this time at C5-6, on September 28, 2021. During this procedure, Dr. Coyle discovered and removed bone spurs at the C5-6 level. On March 29, 2022, Dr. Coyle placed Hauck at MMI and noted there was no change in her current work restrictions and they were now permanent.

C.     Termination and Application for Disability Retirement

On May 12, 2020, Hauck was evaluated by SLMPD Medical Director Dr. Thomas Kibby, who found she was permanently unable to return to work. Hauck had exhausted her salary continuance and accumulated personal time, so she was terminated for being unable to perform the essential functions of her job. Hauck filed for disability-related retirement on June 10, 2020. Over the next several months, she was assessed by a medical board consisting of three physicians commissioned to evaluate her application. Each doctor's evaluation consisted of a physical examination, as well as review of Hauck's medical records.

Hauck was first evaluated by the chair of the medical board, Dr. Russell Cantrell, in October of 2020. Dr. Cantrell noted Hauck's doctors had documented symptoms that could not be explained by her injury and that x-rays and MRI scans revealed degenerative changes at the C5-6 and C6-7 levels of her cervical spine. Dr. Cantrell also pointed to records of her doctors raising concerns of symptom magnification, and ultimately concluded although Hauck was incapacitated, it was not the natural, proximate, and exclusive result of her work accident. Specifically, as to exclusivity, Dr. Cantrell stated his opinion was supported by symptom magnification, the results of her electrodiagnostic studies, and weakness in her biceps and triceps could not be explained by chronic axillary neuropathy.

Next, Dr. Michael Nogalski evaluated Hauck in December of 2020. Dr. Nogalski opined, with respect to her work accident, Hauck was at MMI, but he "[did] not identify any clinical

6

evidence that she sustained a neck injury with respect to her neck condition," and he believed it was an independent issue relative to the work accident. Dr. Nogalski initially concluded, as to her shoulder injury, Hauck was not incapacitated. As to her cervical spine, Dr. Nogalski noted while Hauck may have some limited flexion, he did not believe there was an objective finding to support a significant loss of rotation.

Hauck, at the direction of Dr. Cantrell, underwent a functional capacity evaluation (FCE) on December 30, 2020. During the FCE, Hauck gave full effort, but had limited range of motion. The FCE showed she could not perform the full duty requirements of a police officer, and she was not magnifying her symptoms, which PRS agreed with at oral argument. Following the FCE, Dr. Nogalski supplemented his report to change his opinion, now concluding Hauck was incapacitated. His opinion regarding causation remained unchanged. Dr. Cantrell also supplemented his report after the FCE, and his opinions regarding incapacitation and exclusivity did not change.

Lastly, Hauck was evaluated by Dr. Bernard Randolph in January of 2021. Dr. Randolph concluded Hauck was at MMI and permanently incapacitated, noting her "weakness and limited mobility in the left upper extremity which would potentially disable her from performing certain essential functions of the job such as affecting [sic] a custodial arrest." Dr. Randolph concluded Hauck's incapacitation was a natural and proximate result of her work accident, reasoning the contusion to her arm resulted in posterior subluxation of the shoulder and associated posterior instability. With respect to spinal issues, Dr. Randolph opined Hauck's medical record and clinical findings indicated a neural injury resulted from the work accident, and Hauck's response to cervical spine treatments suggested "that some degree of radicular injury also resulted from the work accident." Without further elaboration, Dr. Randolph concluded Hauck's incapacitation was exclusively the result of her work accident.

7

On May 25, 2021, Dr. David Volarich conducted an evaluation at the request of Hauck's workers' compensation attorney, independent of the medical board's evaluations regarding Hauck's application for disability retirement. Dr. Volarich concluded Hauck was at MMI and, as to causation, opined:

> It is my opinion the injury that occurred on 7/21/17 when Ms. Hauck, while wearing riot gear at a protest[,] was moving in line with fellow police officers and had her left arm on the officer in front of her when a large heavy object struck her left upper arm just below the shoulder joint, knocking her backwards and then causing a whiplash type injury to the cervical spine, after which she experienced severe neck[,] left shoulder, and left upper extremity pain, is the primary and prevailing factor causing the above diagnoses regarding the injury of 7/21/17 which required extensive medical and surgical care. The work injury was the prevailing factor causing her symptoms, need for treatment, and resulting disabilities.

Dr. Volarich ultimately concluded Hauck was unable to return to work as a police officer.

D.      Evidentiary Hearing and Subsequent Proceedings

A formal evidentiary hearing on Hauck's application was held before PRS on March 8, 2023. Hauck testified and her medical records were stipulated to and admitted into evidence. Also admitted into evidence were evaluations performed by the three physicians on the medical board, the FCE report, the evaluation performed by Dr. Volarich, and deposition transcripts of Drs. Coyle and Aleem. PRS then issued findings of fact and conclusions of law, wherein it concluded Hauck was injured in an accident on July 21, 2017, the accident occurred within the actual performance of her duty, there was no negligence on her part, and she could not perform the full and unrestricted duties of a police officer. However, PRS determined Hauck's diagnosis and injury were not exclusively caused by her work-related accident and denied her application.

Following the denial, Hauck sought judicial review. The circuit court reversed the PRS decision, finding PRS improperly applied symptom magnification to the exclusivity element. The court found both her shoulder and neck injuries were work related, and it was sufficient for Hauck

8

to show that both injuries, either individually or in combination, caused her incapacitation. PRS appealed.

## Standard of Review

Judicial review of an agency's decision in contested cases is governed by section 536.140. Appellate courts will uphold an agency's decision unless it is (1) in violation of constitutional provisions; (2) in excess of the agency's statutory authority or jurisdiction; (3) unsupported by competent and substantial evidence upon the whole record; (4) unauthorized by law; (5) made upon unlawful procedure or without a fair trial; (6) arbitrary, capricious, or unreasonable; or (7) involves an abuse of discretion. Section 536.140.2.

Our review is limited to the administrative ruling, and not the trial court's decision. *Conley v. City of St. Louis*, 561 S.W.3d 848, 852 (Mo. App. E.D. 2018). We must determine whether the decision is "supported by competent and substantial evidence upon the whole record." Mo. Const. art. V, section 18. "We review the whole record, and we no longer view the evidence in the light most favorable to the agency's decision." *Nexgen Silica, LLC v. Mo. Dep't of Nat. Res.*, 677 S.W.3d 594, 600 (Mo. App. E.D. 2023). "We defer to the agency's findings of fact so long as they are supported by competent and substantial evidence." *Id*. If there is a question of law, we review it *de novo*. *Id*.

## Discussion

Hauck raises two points on appeal related to PRS's conclusion on exclusivity. Neither party disputes PRS's conclusion Hauck was incapacitated as a result of a work accident. Hauck claims in Point I PRS erred in denying her application for service-connected disability benefits because it acted arbitrarily, capriciously, or unreasonably in applying alleged symptom magnification to the section 86.263 exclusivity requirement. In Point II, Hauck argues PRS erred

9

because its decision is unsupported by competent and substantial evidence as the evidence established her incapacitation was the exclusive result of her work accident.

Service-connected accidental disability retirement is governed by section 86.263, which provides:

> Any member in active service who is permanently unable to perform the full and unrestricted duties of a police officer as the natural, proximate, **and exclusive result of an accident** occurring within the actual performance of duty at some definite time and place, through no negligence on the member's part, shall be retired by the board of trustees of the police retirement system upon certification by the medical board that the member is mentally or physically unable to perform the full and unrestricted duties of a police officer, that the inability is permanent or likely to become permanent, and that the member should be retired.

(Emphasis added).

*Point I – Symptom Magnification*

Courts have defined "arbitrary and capricious" as "willful and unreasoning action, without consideration of and in disregard of the facts and circumstances." *Pro. Fire Fighters of E. Mo., Int'l Ass'n of Fire Fighters, Local 2665 v. City of Richmond Heights*, 680 S.W.3d 134, 142 (Mo. App. W.D. 2023) (internal quotation omitted). "An administrative agency acts unreasonably and arbitrarily if its findings are not based upon substantial evidence." *Id.* (internal quotation omitted).

Although symptom magnification is a factor considered by agencies in issuing decisions involving workplace injuries, in this case it applies to the question of whether the claimant was disabled. *See Roberts v. Mo. Highway & Transp. Comm'n*, 222 S.W.3d 322, 331-34 (Mo. App. S.D. 2007) (evidence supported Commission's finding claimant was not permanently and totally disabled as a result of a work-related accident; medical testimony supported theory claimant's injury was successfully treated and his subjective complaints of pain demonstrated symptom magnification); *Williams v. Treasurer of State – Custodian of Second Injury Fund*, 588 S.W.3d 919, 929-31 (Mo. App. W.D. 2019) (affirming Commission finding claimant failed to establish

10

total permanent disability, which required a showing he was unable to return to the workforce; medical testimony showed claimant exhibited a considerable amount of symptom magnification).

Here, it was unreasonable for PRS to apply symptom magnification to the exclusivity requirement because that factor applies to whether Hauck was incapacitated from fulfilling her duties as a police officer. In concluding Hauck's incapacity was not the exclusive result of her work accident, PRS cited the opinions of Drs. Cantrell and Nogalski: "Dr. Cantrell believes the weakness in [Hauck]'s biceps and triceps cannot be explained by findings of chronic axillary neuropathy. Dr. Nogalski agrees that [Hauck]'s physical findings cannot fully explain [her] physical condition."

In responding to PRS's inquiry as to whether Hauck's incapacitation was the exclusive result of her work accident, Dr. Cantrell wrote:

> No. This opinion is supported by the variable limitations in demonstrated active range of motion over the course of time that to me suggests a degree of symptom magnification. There are also not consistent results of electrodiagnostic studies to support a cervical radiculopathy, brachial plexopathy, or isolated mononeuropathy explanatory for her complaints. Furthermore, the weakness that has been noted in her biceps and triceps could not be explained by the findings of a chronic axillary neuropathy, which may result in shoulder abduction weakness, but would not be expected to result in biceps or triceps weakness.

Dr. Nogalski, who initially determined Hauck was not incapacitated but nevertheless chose to opine on whether the incapacitation was the exclusive result of her work accident wrote:

> As stated above, incapacitation with respect to current findings appear to be related to clinical assessments that yielded inconsistent measurements between objective findings and volitional activities. She does not have any specific physical findings to support sequella [sic] of a "chronic axillary neuropathy" which would have been a postoperative finding after two preoperative studies did not identify an axillary neuropathy. She has satisfactory deltoid function and also normal axillary nerve sensation, so this EMG/NCV finding is not clinically or functionally significant.
>
> As stated above, the cervical issues addressed by Dr. Coyle do not appear to correlate with a specific injury to the neck region. The direct blow injury to the left upper extremity reasonably might have or could have caused a contusion/neuralgia

11

and/or posterior shoulder instability issue, all of which appear to have been addressed optimally with respect to both diagnostic and therapeutic measures by Dr. Aleem.

Although only Dr. Cantrell specifically used the words "symptom magnification," Dr. Nogalski alluded to it in his opinion on exclusivity. These considerations, however, go to whether Hauck was incapacitated, not whether her incapacitation was the exclusive result of her work accident. *See Roberts*, 222 S.W.3d at 331-33. Applying symptom magnification to the exclusivity factor was unreasonable.

Without the application of symptom magnification, PRS's conclusion on exclusivity was not otherwise supported by substantial competent evidence. PRS, in its findings of fact, focused on Drs. Cantrell's and Nogalski's findings regarding symptom magnification:

19. Dr. Cantrell states that findings of chronic axillary neuropathy suggest her incapacitation is not the natural and exclusive result of her work injury.

20. Dr. Nogalski evaluated [Hauck] on December 1, 2020. Dr. Nogalski also evaluated Applicant and reviewed her extensive medical history.

21. Dr. Nogalski reached the same results as Dr. Cantrell.

22. Dr. Nogalski found that Applicant had reached maximum medical improvement but is not incapacitated from performing the full functions of a police officer.

23. Dr. Nogalski cited inconsistent measurements between objective findings and volitional activities.

24. Dr. Nogalski noted that her incapacity is more than 50% related to her work as a police officer.

Aside from symptom magnification, PRS found no other facts to support its conclusion Hauck's incapacitation was not the exclusive result of her work accident. Oddly, PRS mistakenly held Dr. Nogalski had found Hauck not to be incapacitated, but cited his opinions regarding the causation of her incapacitation. In fact, although Dr. Nogalski initially determined Hauck was not incapacitated, he changed his opinion following the results of Hauck's FCE.

12

Hauck possibly magnifying her symptoms would have been a reason to determine she was not incapacitated from performing her duties.  PRS, however, determined she was unable to fulfill her duties.  Further, without making any findings beyond symptom magnification, PRS concluded Hauck's incapacitation was not the exclusive result of her accident.  The record reflects no other finding that PRS relied on in making its determination besides symptom magnification.  Therefore, we hold PRS acted unreasonably in applying symptom magnification to the exclusivity requirement in section 86.263.  Point I is granted.[4]

We turn now to Hauck's motion for attorney's fees.  Attorney's fees in agency proceedings are governed by section 536.087, which states:

> A party who prevails in an agency proceeding or civil action arising therefrom, brought by or against the state, shall be awarded those reasonable fees and expenses incurred by that party in the civil action or agency proceeding, unless the court or agency finds that the position of the state was substantially justified or that special circumstances make an award unjust.

"Substantially justified means that the agency's position was clearly reasonable."  *Nexgen Silica*, 677 S.W.3d at 609 (internal quotations omitted).

Hauck is not entitled to attorney's fees in this proceeding.  PRS argues both it is not the state for purposes of section 536.087 and its position was substantially justified.  We need not reach the issue of whether PRS is the state or a political subdivision because its position was substantially justified.  PRS's position regarding exclusivity was clearly reasonable because the issue has not been raised since the amendment adding the exclusivity requirement went into effect in 2009.

---

[4] We do not determine whether PRS's denial of benefits is supported by competent and substantial evidence on the whole record.  Instead, PRS must reconsider exclusivity on remand.

13

## Conclusion

For the reasons set forth above, we affirm the judgment of the circuit court[5] and remand for PRS consideration of whether Hauck's incapacitation was the exclusive result of her work accident, consistent with this opinion. We deny Hauck's motion for attorney's fees.

_Virginia W. Lay_
Virginia W. Lay, J.

Michael S. Wright, P.J., concurs.
Philip M. Hess, J., concurs.

---

[5] Although we review the administrative agency's decision and not the trial court's judgment, "[n]evertheless, in our mandate, we reverse, affirm or otherwise act upon the trial court's judgment." *Beckemeyer v. Firemen's Ret. Sys. of St. Louis*, 424 S.W.3d 1, 4 (Mo. App. E.D. 2013).